The pleasure of receiving a motion. Judge Lynn. Thank you, Chief. It is my pleasure this morning to move the admission of Samantha Jamieson. And I know of her qualifications quite well. She has served with distinction as my law clerk for the past year and a half. And she has made a tremendous contribution to the work of my chambers and to the work of this court. So without further ado, I move the admission of Samantha Jamieson, who is a member of the Bar and Good Standing of the highest court of North Carolina. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. And I think she's served the court magnificently, too. I think she's served the court with distinction and honor. We're happy to grant the motion and hope we see a lot of her in the future. Maybe we could ask our circuit executive to issue the oath. Do solemnly swear and inform yourself as an attorney and counsel of this court, by right and according to law, that you support the Constitution of the United States. I do. Congratulations. Thank you. Congratulations and welcome. Our first case this morning is Floor Intercontinental versus Carey. Ms. Millett? May it please the court. I'm Patricia Millett on behalf of Floor Intercontinental in this case. While the record is long, it takes one simple legal proposition to largely resolve this case. And that is, when the government admits it has made erroneous statements, admits it should have changed those statements, admits those changes, those statements caused harm, and admits its responsibility for those consequences, admits the consequences that ensued from those erroneous statements, neither general disclaimers, the absence of a warranty. Counsel, your client visited the construction site and saw what was available, and saw the status of the utilities and the other promised factors from that that were promised to you, or at least were stated that they would be there. But didn't your client see that they were not there at all and on those site visits? What our client saw was, in fact, that they are in progress and that tremendous work was underway. And the government said the same thing, that it was in progress. These sites are in our brief. Keep in mind, this is what's critical. While much weight is put by the board on the fact that this is a design-build contract, it forgot that in this proposition. When you have a design-build contract and you're visiting a site for three days on government schedule, it's a year before. This was in July of 2003. And you want us to date any, how can June of 2003 be the date that you say you deserve compensation? The date we deserve compensation for is June, July, August, and October. But in July, you're there and you already know it's not in place. How can you suggest that June should be the date? Here's what's critical. First, we're not suggesting the entirety of the contract and the post-contract representation in October 2003. But keep in mind, a design-build contract means when you're there in July, you're not starting construction for almost a year. Construction did not start until summer of 2004. And so when things are in progress and you see work underway, and then you do exactly what a contractor should do, you ask the government a question after your July visit. These questions and answers are in the record and cited in our brief. And just before you enter your bid, the government says, you'll need to provide for mobilization. When asked about mobilization and construction, they answer, only mobilization. So they, in fact, compounded the problem. We did our visit. We did what you should do. We asked questions. And the government said it again, very selectively. And then in October 2003, post-contract, when we did another visit with them, they said they would be there in March 2004. And we made decisions then about our design, precisely based on that representation. Didn't the government representations, weren't they posed in the future as it was as to the likely availability of the utilities and not, let's say, a contractual promise? No, I think I'm happy to go march through the provisions with you. But there's two critical things to keep in mind here. There were two representations going on. So far, we've only talked about, will utilities be there? There was representations that utilities will be there and who will pay for those utilities. And that's the most critical one. Now, a pre-site visit isn't going to tell you who's paying. But looking at the contract, it says, the contractor acknowledges that it's taken the steps to ascertain the nature and location of the work, and the government assumes no responsibility for any conclusions based on those observations. Isn't this very clear, that you're assuming all responsibility? Absolutely not. And this court's precedent, including things like K Brown constructors and the other cases we cite, is that general disclaimers like that do not vitiate specific affirmative representations made by the government about specific conditions. Again, not just will the utilities be there and the infrastructure be there, but who will pay? Look at EFS, I'm sorry, the Engineering Feasibility Study on JA67. There's a specific question. Who will pay? Who is going to bear the cost? Local government. Check that. Yes. That's what you're most concerned about when you're a contractor making a bid. Who is going to pay? And we were told again and again that whatever happens, they would be there, and it would not be our responsibility. And the best evidence of what these contract documents said is, look at the government's own budget estimate in this case. Did the government say to counsel that we can't confirm that the utilities will be in place upon mobilization? I mean, you were told that there's no. Mobilization, yeah, that's the problem, Judge Wright. We asked about mobilization and construction because we have these representations in the contract. We went there, we saw stuff underway, but we weren't sure. They marched out for us. The government marched out for us, the Kazakhstan government official who said it would be there as well. But they said, then we asked those questions and answers. And if you want to look at those, those are on 218 and 222 of the appendix. And we said, please confirm that they'll be, this was just with respect to electricity, it'll be there for mobilization and temporary construction use. And the answer was, plan on it for mobilization. And mobilization is a few-month period. It was around three or four months here. And that's what we were able to plan for, because we were told to plan for that. But there was no government guarantee. It was clear, was it not, that the government was representing the assurances it had received from the local government that these things would be in place. And it seems to me a fair reading of all of the documentation is that, you know, if this doesn't really materialize as promised, you bear the risk and you have to be prepared for that. No, absolutely, with respect, that is not correct. First of all, the question here- Well, show me in the record where I'm wrong. Absolutely, the first question is, the premise of your question is there a promise, this is about misrepresentation, not a warranty. Now, misrepresentation is simply a statement- Where is the misrepresentation? And they are, we can start, we can start with the questions and answers. You have to build to it. The Environmental Engineering Feasibility Study on JA67, all right, all right? If the utilities aren't in place, can the government rely on Kazakhstan government to install them? Yes, that's unequivocal yes. Who is going to put them in there, all right? Who will bear the total cost? That doesn't talk about when. For our bidding purposes, that's the next question that I said, who will bear the total cost? And it was the Kazakhstan government. Unequivocally yes, no qualifications. Did you have any experts on Kazakhstan? I don't know, I recall we had experts on- I've been to Kazakhstan a half dozen times. I could have told you, you were gonna have trouble with infrastructure. Well, that's why it's so important when they tell us who's gonna pay for it and who is responsible in JA67. Well, no, if I was writing a contract in Kazakhstan, I would want language that says more than this, wouldn't I? What I would want is language, and then I would want confirmation from the U.S. government because while I might be worried about the state of things in Kazakhstan, who do I trust? I trust the U.S. government because they're on the ground. They've been there for multiple years and told us what's going to be there. And their own budget report, their own budget report specifically says, and this is JA284, this is how they budgeted the contract, all right? The utility and roadway infrastructure are to be constructed by the Kazakhstan government at no cost to the U.S. government. Well, then it can't be a cost to the contractor that we're supposed to put into the contract if it's no cost to the U.S. government. It's those cost representations that are most critical to us as bidders in this situation. Maybe I'm confused, but it seems to me that there's no question that the government was going to provide the utilities at the government's expense, but there seemed to me to be some serious question about when they were going to do it and whether there could be any assurances that it would be done at a particular time. And the fact that they didn't provide the utilities at an appropriate time caused the client some delay. I understand that, but it seemed to me that the documents also indicated that be advised that you bear the risk. No, they just didn't say that. I mean, they don't have anything to say. The government assumes no responsibility based on the information made available by the government? Unless this court is going to write an opinion that says general disclaimers display specific representations, and this will be contrary to other decisions of this court cited in our brief, that can't work. But look at, you asked for more on the contract, right? Look at H-15, they cite that, and it talks about temporary utilities, and what does it say? And I'm sorry, H-15 is in the second volume of the joint appendix, and it's on page 1272, all right? Temporary utilities, all right? Look at H-15-1. First of all, the contractor can only install temporary utilities with the, may install them with the consent of the contracting officer. Well, that's not a predicate for us having to install everything, and then look down at what this contract language says in H-15-4, all right? We are to obtain utilities. That's not building it from the ground up, that is not. When they want to talk about erecting and building it from the ground up, in H-15-1, they use the word erected. We are obtaining, look at the next section, we are connecting, all right? We are, in H-15-4-4, we are paying bills to the local utility, all right? That contract language, and you look at all the contract language together, the engineering feasibility study, the site report that said it's very important that those utilities will be there for the construction or they'll be considerable expense, and at the end of the day, the issue for us is, it didn't, you know, it's water under the bridge, what didn't happen, but who should pay for it when we've been told, we, on 67, and in that report, and again and again, that we don't bear that cost, I apologize. So I look at the record at JA-218, and the question is asked, please confirm that all infrastructure utilities will be in place on the site upon mobilization. We're at minimum concerned, and it goes on, asking about contractual obligations or liability. The response was, we can't confirm that utilities will be in place upon mobilization. Plan on standby generators for mobilization power, as a site will be in an area without any existing utilities. Please plan accordingly. This is exactly a key provision to the training. Why, for two reasons. Because the answer is only about mobilization. When we've had prior representations about construction, and we've been there, and we've done our site visit, and we say, hey, we see things in progress, and we're not sure, and the only window of time they say you've gotta have your own there is mobilization. And you can see that, again, in the next section on page 222, 25. But after mobilization, the power never showed up. The utilities, I mean, you're being told that at mobilization, you better plan accordingly, because there's no utilities, and we don't know if there's gonna be any. So, isn't that telling you from that point afterwards, and you better plan accordingly? Two responses to that. First of all, again, when you ask them, as we did in the next question on 222, about mobilization and temporary construction, and the only answer is about mobilization, that actually tells you the opposite. If you say, will it be there Sunday or Wednesday, and they say, not Sunday, you're still in, they think it's gonna be Wednesday. But isn't that telling, you better be aware, you better be careful, because it may not be there Wednesday either. No, it is not. I think, and remember, two responses again. In October 2003, after they awarded the contract, we asked them again, and this is cited in our brief, and they said they'll be there in March. So, when we were doing our design, they said it again. So, we can't even stop here. This isn't the last word. The last word was always that they're coming, but also, back on your question nine on 218, it's asking two things. Will they be there, and that we have no liability? And even if you think that we were warned enough that they'll be there, and I don't think this is how we want government to behave in writing contracts and making representations, but the liability, who is going to pay? That's when we were told, without qualification, without asterisks, again, and again, and again, is not on the contractor, and we know that's- Where does it say that? At the very bottom of 218. And it's confirmed- No, that's the question. Where's the answer? Exactly, they don't dispute- Isn't that your job? No, it's not, because they have already told us on, and this is in the engineering feasibility study on page 67, that you don't bear the cost. They've told us that specifically. And in the site report, they said, we know it's gotta be there, or it'll be considerable expense, right? And that's on page 122. And then we go there for the visit, and we see they aren't there, and we ask them, which is what you want contractors to do, and what do they say? When we say, will it be there, and make sure we have no liability, the only thing they roll back from all their prior representations is that it might not be there for mobilization. You have to read these as ordinary, reasonable people would be, and when you've been told something multiple times, and you ask a question- Your questions, and in your brief, and here in your argument today, you're talking about who's bearing the cost, who's bearing the liability. And the government's answering that it's the government of Kazakhstan that bears the cost. But it never answers the question of liability, does it? The liability is the cost question in this context. It's will it be, there's two questions going on. They started back on page 67. It hasn't said that you bear the cost. It said that the government of Kazakhstan- Exactly, and now we're bearing the cost. That's what this case is about. We ended up bearing the cost, and you talked about what do you want contractors to do. It's because you proceeded without the utilities and the infrastructure being there, and these other things. You went ahead with the contract, with the construction, expecting, I guess, that the government of Kazakhstan was gonna cough up the cost. We went in there, not with expectations, but with contract language, that engineering feasibility study's part of the contract. The questions and answers, by the way, came in four days before we put our bid in, in August 25th. We asked again and again to pin this down, and you don't wanna put- Mr. Millett, we've used all of your time, not including your rebuttal. Why don't we give you a minute back, and will you give an extra minute to Mr. Regner, if he needs to use it? Mr. Regner? Good morning, and may it please the court, I'll address, I'll focus primarily on the infrastructure and utilities claim. It seems to be where we've spent a lot of time already. The findings of fact by the board were correct. It found that the statements that Floor contends- Wouldn't the government correct the misstatement by Ross? Oh, the misstatement by Ross with respect to the Russian steel and the foundation- Yes, that's the Russian steel part of the thing. Right, what the board found on that issue was that that statement was not the reason why Floor changed its pile design. There was, it actually made two different findings. One was the reason why Floor did change its pile design, which was because of its own lateness in getting to finding a subcontractor that could manufacture and drive those piles. That's why it changed the pile design, but the board went one step further and said, no, that's not, that the Russian steel statement by Mr. Ross was not the reason. And that's why- Now I'll ask my question again, and maybe you'll answer it this time. Oh, I'm sorry. Why didn't the government correct the misstatement by Ross? According to Mr. Vivian, and it's not particularly clear as to the timing, but in the cross-examination of Mr. Vivian, they confronted him with the statement that was about two years later when he was looking into whether it was a true statement or not. And so it appears that he was not aware that Mr. Ross made that statement at the time. And he also testified that he did not realize that the contractor was relying on that statement. He was correct because they weren't relying on that statement and so there was no need to correct the statement because at that time, they had already changed their design to the steel age files. That sounds like afterthought. I mean, you're telling us now that they didn't have to correct the statement because it really didn't matter anyway because they didn't rely on it. But I'm also thinking along the same lines as Judge Rader, why did the government not correct the Ross statement? Well, before the statement was made on January 15th, that same email, or it's a progenet, it's an email type service that the designers can talk to each other. But in that same string of communications, prior to Mr. Ross making that statement, Floor explains that they're already looking for alternate sources of steel. And so when Mr. Ross makes the statement, it's a statement that has no impact on what Floor is already doing or what they're going to do later. And so anybody, including the contractor- They're arguing it had great impact. Well, they certainly are. And that is an after the fact argument because at the time, what Floor's designer, Mr. Toedtwein, he's the executive director of operations, said was it wasn't just the steel. This was his testimony before the board on page 1307 of the joint appendix. He says it wasn't just the steel. It was his leading Stroid Constructies fabrication process and the quality of materials he's using versus the specification that Floor provided. But it could be both. I mean, obviously the design was a factor and the absence of available local steel is another factor. Well, and that's an argument that Floor has made that there's the multiple causation theory. It seems to me the board's finding that the problem was due to the redesign itself only is it lacks substantial evidence. No, not at all. The multiple causation theory that Floor posits is based on the Cal Federal case and the Anchor Savings case. And in its brief, what it doesn't quote from those decisions is the nugget of what has to be shown. First, that the causation has to be definitely established. And then also that there has to be but-for causation. That is, but for the Russian steel statement, Floor wouldn't have done the redesign. But here we know from the testimony of Mr. Toedtwein and Mr. Manchester at the board, both Floor employees, they said, no, the reason why we changed this was not just because of the steel, it was because of the other things, the problems with the subcontractor being able to manufacture and install those piles to meet quality control statements and so forth. And so when we go back and look at what the board found and whether it's supported by the substantial evidence, the answer is absolutely yes, because the board looked at particularly the timeline of things and determined that when Floor made its change, it wasn't after Mr. Ross's statement. Mr. Ross's statement was made on January 15th. After that point, and Mr. Ross said in that exchange that if you want to get an exception to that requirement, you can. After that statement, Floor doesn't do a lot of things. It doesn't seek an exception to the requirement. It doesn't change its design. Weeks and weeks go by. Then it meets with Stroy in March. And it's after its meeting with Stroy, and only after its meeting with Stroy a couple weeks later that it comes out with its pile design change. And the board looked at that and said, yes, that's the evidence that tells us that in fact the real reason, in addition to Mr. Todvine saying it, but that's the real reason why Floor changed its design from precast concrete to steel H-piles. Mr. Regner, we spent a lot of time with Ms. Millett about this statement on JA-67. It says, if the utilities are not in place, can the U.S. government rely on Kazakhstan to install them? Box checked, yes. And that's a statement that the floor, that- Can they rely on that? No. That you're going to do? No, and in fact, they haven't up until now. In their briefs, they don't make the argument that the misrepresentation had to do with payment. It always had to do with timing. But we can respond to that. There's an important distinction in the utilities between the temporary utilities and the permanent utilities. The temporary utilities are for mobilization and construction, those things that the contractor needs while it's putting the building together. The permanent utilities are, of course, those things that the State Department's gonna use to run its fax machines and copiers. That statement in the EFS is relating to the permanent utilities. Those utilities that are being brought in from off-site for permanent use. And the reason why- Is that all clear in this? I get the impression, and I have in so many of these cases, that it's a game. You try to tell them as little as you can, and they try to acquire more information. Why isn't there just a forthright exchange of everything you know or may know? Is there legal implications? I understand that's the answer. No, Your Honor, there wasn't. You're not gonna give me that answer, but that's the answer you're giving me. The answer, I believe, respectfully, Your Honor, is that there was a forthright exchange of information that the government had in the EFS, it had an SUP, and it handed it to the contractor- They ask you where the liability's going to be, and you don't answer that part of the question. You say, well, mobilization, you're on your own. The government said specifically where the liability falls, and it's in H15.1. It says, temporary utilities shall be built with labor and materials furnished by the contractor, the cost of which is included in the contract price. That is, for temporary utilities, FLOR will pay for and build those utilities. And it says what kind of utilities they can use, and that's in Section C. It says it shall not rely on anything other than standby generators. That is, if it wanted to use the permanent utilities that were coming in from the Kazakh government, it would have to get a contract changed. The contract said, you're going to use standby generators, and we know that's what FLOR actually planned to do. They didn't rely on any of those statements. You can look at their pre-design meeting PowerPoint, and that is at page 436 in the record, and FLOR says, we're going to rely on onsite generation for temporary power. And of course they did that, because that's what they were required to do. It says that in Section H. Well, they had to do it, because the Kazakh government had not extended any utilities out to the construction site. That's right, and they wouldn't until... And you had told them, the government had said, this, the government of Kazakhstan is going to do this. We talked to them, and they've agreed that for our embassy, they're going to put in place utilities. The government passed along the information, the best information it had from the Kazakh government, which was that they had committed to do that by June of 2003, a statement which, by the time FLOR had submitted its proposal, two months later... But FLOR wasn't part of those negotiations. No, but they had the responsibility under the contract to go and get those utilities, to go speak with the Kazakh government at the site visit. That was part of the pre-bid site visit, was to speak with the Kazakh government. Do you see the bind that they're in? I mean, they bid on these specifications of the RFP, and in there, you're telling them, we will have for you, we're ensuring that you're going to have utilities, electricity, and everything else, up to the construction site. After a while, it's not there. So, I mean, they have to use temporary power. I mean, they had no choice. Respectfully, that's not what we told them. That's not what the government told FLOR. They told FLOR that they could not rely on the off-site utilities for temporary power. They said, in section C, they said, the design-build contractor shall rely solely on standby generators for construction power. That is what FLOR bid on, was to use on-site generators for temporary power, and that's what they did. That's what they relied on. We know that because of the PowerPoint and their bid as well, but it's most clearly stated in the PowerPoint immediately after they submitted their proposal. And so, what we told them was that they had to use the on-site generators. You couldn't use the off-site utilities. The reason why there's even- Why wouldn't you amend the contract when you saw there were no utilities present? According to the testimony of Mr. Vivian, the contracting officer, the way he dealt with that was- And of course, everybody knew that by the time in August of 2003, the utilities weren't there, and so the statements were mostly meaningless. But what Mr. Vivian, the contracting officer, said he did was he pointed to section C of the contract and said it didn't matter because what we put in the contract was that you shall rely on standby generators. So, it didn't matter when those utilities were gonna come in, as long as they came in before permanent power was needed. And that's not an issue in this contract. Permanent power was available before substantial completion. It's not part of the claim. So, the contractor was told that if you wanna use- First of all, you're responsible to provide your own utilities with your own money and your own forces, and that you have to do that with standby generators. That's in the contract. And so, anything else, it made no sense then when the question was asked, will you have permanent utilities in time for temporary use? There was no need to answer that question because you couldn't use permanent utilities for temporary use. That was in section C of the contract. What the government did was provide the best information they had with respect to what the Kazakhstan government was likely to do. It turned out that the Kazakhstan government didn't meet its commitments, but that was all with respect to the permanent power. And in fact, although they didn't meet the June 3rd date or later, the March 2004 date, those utilities were onsite and ready in time for substantial completion. Reading Mr. Vivian's response, the contract documents should have been amended. However, they were not. But we did change section C to reflect that the contractor should not depend on the utilities being present. That's a little different than the answer you gave. He said directly, the contract documents should have been amended. However, they were not. And- Is that an omission against interest? They should have been amended. You didn't amend them. Well, he's saying we were wrong. Well, based on the findings of the board that the statements were not inaccurate and they weren't inaccurate because- He's the one that says it's kind of after the fact that we find in section C that we might have a way out. But we should have amended the contract. That's not the answer you gave. Well, he should have, but he also said in the same place when asked about redacting the EFS, those same statements, he said, well, would the redaction have made the documents more accurate? He says, well, no, not more accurate. And then he points to section C again. And the reason why is certainly to make the contract the cleanest it could be, having representations in there that the utilities would be arriving at the site in June of 2003, now that the commitments weren't necessary to be in there, but in terms of getting to the cause of action. They weren't misrepresentations and you couldn't rely on them. So although a contracting officer might think the cleanest way to put these documents together would be to take that out, what he said was if you read the contract as one document, then it's accurate. And that's why he's pointing to section C, which says the contractor couldn't rely on anything but standby generators for temporary power in any event. The issue of the offsite utilities went to permanent power, not to the temporary utilities. I have a short period of time. I think it makes sense to spend just one moment on the perimeter wall. And the board's findings were correct that the floors wall did not comply with the IBC frost heave requirements. The board had substantial evidence to rely on the expert testimony of Dan Cecil, WSA's own report, including addendum five, which it produced during the course of the project, and the testimony of, or the email from Herb West dated March 30 of 2005. This is an internal email from Herb West, who was floor's design manager. And what Herb West said with respect to whether the wall met the IBC requirements for frost heave, he was very clear and candid speaking to his own people. It does not comply with the minimum requirements of the IBC. And that was at page 1453 of the joint appendix. That's sufficient for the board to have found that the wall did not comply with the IBC frost heave requirements. And for that reason, the findings of the board were correct and supported by substantial evidence. And if I could make one last point on the wall. There's an issue that floor has raised in its latest brief that somehow the government may have waived the design defect through the design review process. We cited Kenneth Reed's reconstruction that the actions of the government in respecting the performance of the contract are not a waiver of the contract requirements to comply with the contract. And we would submit that that's exactly the tenor and the words in the design process. There's nothing in that process of the collaborative design of which there certainly is a collaborative design process in which the government said, we waive our right to enforce the contract just because you've moved on from the 35% design to the 60% design to the 90% design. That's just simply not there. The only time that the government would waive any of its right would be, if at all, would be at the final acceptance of the entire project, not simply because of its participation in the design process. And for those reasons on all of the counts that were before the board, this court should affirm the decision of the board denying floors claims on all fronts. Thank you. Mr. Regner, Ms. Millett, you have a minute. Thank you, just three quick points. With respect to, not only did they say they should have changed the contract with respect to utilities, why didn't they? The gotcha game that's going on, look at 1089 to 90, Mr. Vivian's testimony, and 1029, the purchasing contracting officer's testimony. We did it, we knew they would rely on this and it would get lower bids and they'd be locked in. That's exactly the gamesmanship that you referenced, Judge Rader. With respect to the piles on causation, look at the State Department's own admission, its own post-project report, page 641 of the appendix, where they say that their Russian directive is what caused the change and it impeded the progress of the work. In 1096 to 98, the testimony of Mr. Vivian, admitting, again, it should have been changed and they had consequences. The causation that the board found was a symptom, not a cause. This Russian directive set in motion extraordinary amount of problems, including, what does it say? It said you couldn't get the local folks to provide what you needed. Why couldn't we? Because they all used Russian steel. It's all tied together. The board needed to do the very type of careful analysis that it left out. But the board said the reason that happened, because they couldn't drive the piles far enough. Yeah, that just doesn't, the board's decision is either wrong or it runs into itself, because our feet. No, but that's a fact, unless there's, we're gonna have to accept that fact. Well, there has to be something in the record to cite that, to support that fact. And the board's decision, so that you don't even have to get to substantial evidence, look at page 21 of the board's decision. It notes that we found a pile driver. The pile driver was there within a week of having the piles. We weren't having any trouble finding anybody. And the reason they were there within a week, look at our engineering feasibility, I'm sorry, our geotechnical engineer study, which says, I think it's 505, but the geotech study itself says that we had 15 companies available to drive those piles. And the board's decision itself on page 21 notes it was there within a week of the piles. Thank you, Ms. Millett. Thank you very much, I appreciate it. I think that's our time. Our next case is,